UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCIE SCOFIELD,

        Plaintiff,

v.                                                              CASE NO. 1:12-CV-200

                                        HON. ROBERT J. JONKER

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON, et al.,

        Defendants.

_____/

## OPINION

Plaintiff, Marcie Scofield, brings this action for long-term disability benefits against Defendants Liberty Life Assurance Company of Boston ("Liberty") and Farmers Group, Inc. Employee Long Term Disability Plan under 29 U.S.C. § 1132(a)(1)(B), a civil enforcement provision of the Employee Retirement Income Security Act ("ERISA"). Liberty has filed a motion for judgment on the record (docket #25). For the reasons set forth below, the Court will grant judgment in favor of Scofield for benefits through June 25, 2011. However, the Court will remand to Liberty consideration of Scofield's eligibility for benefits after June 25, 2011.

### I. Factual Background

Scofield is an approximately fifty-year-old woman formerly employed as a Special Claims Adjuster by Farmers Group, Inc. ("Farmers Group") from June 2000 to January 2009, when she discontinued working for medical reasons. (Compl., docket #1, at 4; AR, docket #14-4, at 146.)[1]

_____

[1]The Administrative Record (AR) consists of CM/ECF docket numbers 14–19, 21, and 28 (supplement). The page numbers refer to the CM/ECF Page ID numbers, not the internal pagination.

As a Farmers Group employee, Scofield was insured under the Farrmers Group, Inc. Group Disability Income Policy ("Policy") issued by Liberty. (AR, docket ##14-1, at 57–93; 19-3, at 1197.) The Policy vests Liberty with authority, "in its sole discretion, to construe the terms of this policy and to determine benefit eligibility." (AR, docket #14-1, at 85.) The Policy has a 180-day elimination period for long-term disability coverage, meaning that long-term benefits are not payable under the policy for the first 180 days after the disability leave begins. (*Id.* at 59.) For the first 24 months following the elimination period, the Policy defines "disability" as the inability to "perform all of the material and substantial duties of [the Covered Person's] occupation on an Active Employment basis because of an Injury or Sickness." (*Id.* at 61.)

### A. Initial Decision Awarding Benefits

Scofield began disability leave on January 6, 2009 due to fibromyalgia, chronic fatigue syndrome, and migraine headaches. (AR, docket #19-4, at 1246–47.) Liberty approved short-term disability benefits under the Farmers Group Short Term Disability Plan. (AR, docket #19-3, at 1197.) On July 8, 2009, Liberty approved Scofield's claim for long-term disability benefits, with an eligibility date of June 25, 2009. (AR, docket #18-5, at 1101–02.) In support of Scofield's long-term benefits claim, Liberty received records from Scofield's primary care physician, Dr. Michael Rush, and rheumatologist Dr. David Hamm. (AR, docket #19-1, at 1116–44.) Dr. Rush opined in a restrictions form dated July 1, 2009, that Scofield was unable to return to work at that time due to "increased severity" of fibromyalgia, chronic pain syndrome, fatigue, and weakness. (*Id.* at 1115). He documented that she needed assistance getting up, had upper and lower strength weakness, was experiencing severely limited mobility—noting that she was using a wheelchair at that time—and unable to do any lifting, bending, walking or standing. (*Id.*) Dr. Hamm noted that Scofield had "a

2

very entrenched, fibromyalgia-like chronic pain syndrome complicated by depression and physical deconditioning." (*Id.* at 1138.)

### B. Medical Review

Subsequent to its initial approval of Scofield's long-term disability claim, Liberty continued to request periodic updates to Scofield's medical records, which Liberty's "consulting physicians" reviewed. (*See* AR, docket ##18-3, at 978–84; 18-4, at 1021–25 (Dr. Neepa Shah file reviews); docket #18-2, at 955–64 (Dr. Anuj Sharma file review).) Based on updated records and periodic file reviews, Liberty continued to pay Scofield long-term benefits through 2010. (AR, docket #14-2, at 106–23.)

Scofield continued to be seen by Dr. Rush and various medical providers, including Dr. Keith Javery and Physician's Assistant Aaron Greene at the Javery Pain Institute, (AR, docket ##15-3, at 334–94; 18-1, at 882–87), and later, Dr. Laurie Braker, who replaced Dr. Rush as Scofield's primary care physician (AR, docket #16-3, at 537–53). On November 29, 2010, Scofield saw Dr. Gary Miller, D.O., a neurologist, who interviewed Scofield and administered the Montreal Cognitive Assessment ("MOCA") exam, on which Scofield scored 16 out of 30. (AR, docket #16-3, at 555–56.) Miller interpreted the results as demonstrating "significant functional problems," opining the existence of an "underlying co-morbid general medical and neuropsychiatric dysfunction" and "depression likely playing a significant role." (*Id.* at 556.) However, he advised that the significance of his findings required further evaluation based on "formal neuropsychometric test battery." (*Id.*) Formal neurological testing was never conducted. On January 31, 2011, Scofield saw Barbara Rounds, OTR, for an occupational therapy functional capacity evaluation ("FCE"). (AR, docket #16-4, at 606–13.) Rounds concluded that Scofield's "level of function appear[ed] to be limited by

3

progressive, variable & multi-area pain, fatigue, muscular weakness involving the upper and lower extremities and bilateral hands, impaired coordination, limited shoulder mobility, and balance deficits." (*Id.* at 611.)  She therefore concluded that Scofield "appear[ed] to be functioning at less than the full range of SEDENTARY work as defined by the U.S. Department of Labor: Dictionary of Occupational Titles," and specifically opined that Scofield's "need to frequently alter static positions will most likely affect her level of productivity. . . . [If Scofield] was required to work a 40 hour work week, 8 hours per day she would most likely have serious limitations as to pace and concentration and would need to have a sit-stand option as symptoms dictate." (*Id.*)  Rounds recommended that Scofield was "best suited for part time work with flexible scheduling." (*Id.* at 612.)

### C.  Decision to Terminate Benefits

On April 27, 2011, Liberty informed Scofield that she was no longer eligible for long-term disability benefits.  (AR, docket #15-2, 286–90.)  Liberty based its denial on file reviews by Doctors Mark Burns, Lev Basin, and Terry Troutt.  (*Id.* at 286.)  According to Liberty's denial letter, Dr. Burns, an internist specializing in rheumatology, conferred with P.A. Greene, who "concurred that there is a large discrepancy between the objective physical findings and [Scofield's] complaints." (AR, docket #15-2, 287.)  He also observed that P.A. Greene's assessment that Scofield was disabled "relie[d] greatly" on the FCE but "concurred that there [were] otherwise no physical findings consistently documented that would lead to interference with [Scofield's] activities of daily living." (*Id.*)  Dr. Burns thus concluded that the degree of impairment noted in the FCE was not explainable by the available physical findings, but recommended that the FCE be evaluated "by a reviewer experienced in performing and evaluating [such assessments]," suggesting that Dr. Burns

4

was not qualified to interpret the FCE. (*Id.*) Dr. Basin reviewed Scofield's file from a psychiatric perspective, concluding that there was some evidence of "depressive symptoms" but Scofield was not impaired from a psychiatric point of view. (*Id.*) Finally, Dr. Troutt, board-certified in physical medicine and rehabilitation, reported that Scofield's doctors' treatment notes elaborate on Scofield's "subjective complaints of pain" but failed to "describe any measures of functional deficits in terms of range of motion loss, neurological deficits in terms of sensory loss or strength loss, no muscle atrophy." (*Id.* at 288.) Dr. Troutt discredited the FCE by Rounds on the incorrect understanding that it was more than one year old. (*See id*; docket #16-4, at 607–13.) According to Liberty's denial letter, Liberty denied Scofield's claim because the medical documentation did not support that Scofield had any restrictions or limitations precluding her from performing the duties of her occupation. (*Id.* at 288.)

### D.  Administrative Appeal and Review

Scofield filed an administrative appeal of Liberty's denial on October 18, 2011, accompanied by a "Physician Statement of Disability" signed by Dr. David Sova, Scofield's then-primary care physician. (AR, docket #15-3, at 317–18.) Dr. Sova's statement indicated that he had evaluated Scofield for fibromyalgia and described various medications prescribed. (*Id.* at 317.) He concluded, "[i]t is my medical opinion that Marcie Scofield is disabled from her own occupation as a special claims adjustor and would also be totally and permanently disabled from any other occupation for which she is reasonably fitted by training, education, experience, age and physical and mental capacity." (*Id.* at 317–18.)

In reviewing Scofield's appeal, Liberty solicited a file review from Dr. David Smith, an internist specializing in rheumatology. (AR, docket #15-1, at 264–70.) Dr. Smith reviewed

Scofield's medical records and consulted with Dr. Sova and P.A. Greene.  (*Id.* at 264.)  Finding that the FCE was the most "salient and relevant" evidence of Scofield's work capacity, Dr. Smith focused much of his file review report on the shortcomings of the FCE, which he concluded lacked "practical value for external use such as determining employability."  (*Id.* at 268.)

On the basis of Dr. Smith's file review, as well as the prior periodic file reviews, Liberty denied Scofield's appeal on December 21, 2011 because Scofield had not produced sufficient documentation that she was disabled within the meaning of the Policy.  (AR, docket #15-1, at 253.) Scofield filed this action on March 2, 2012.

## II. Legal Standard

ERISA regulates, among other things, employee welfare benefit plans that provide insurance benefits in the event of disability.  *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 604 (6th Cir. 2009).  "ERISA permits a participant or beneficiary to bring a civil action (1) 'to recover benefits due to him under the terms of his plan,' (2) 'to enforce his rights under the terms of the plan,' or (3) 'to clarify his rights to future benefits under the terms of the plan.'"  *Id.* (quoting 29 U.S.C. § 1132(a)(1)(B)).  The parties agree that this action should be resolved under the procedural guidelines set out in *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998).  Under *Wilkins*, the Court determines the applicable standard of review and whether the material in the administrative record supports the denial of benefits under the applicable standard of review.  150 F.3d at 613, 616–19.

In this case, the parties dispute the applicable standard of review.  Courts ordinarily review de novo an ERISA plan administrator's decision to deny benefits.  *Evans v. Unum Provident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006) (citing *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 659–60 (6th

Cir. 1998)).  However, where the ERISA plan grants a plan administrator discretionary authority to determine eligibility for benefits or to construe the plan terms, the Court reviews the denial of benefits under the "highly deferential arbitrary and capricious standard of review." *Id.*  Nonetheless, in 2007, the Michigan Office of Financial and Insurance Services (OFIS), under its authority to regulate insurance, promulgated rules prohibiting insurers from issuing, delivering, or advertising insurance contracts or policies that contain discretionary clauses giving deference to plan administrators.  *Am. Council of Life Insurers*, 558 F.3d at 602 (citing Mich. Admin. Code R. 500.2201–500.2202 and 500.111–550.112).  The Sixth Circuit has held that ERISA does not preempt state administrative rules that prohibit discretionary clauses.  *Id.* at 608–09.  In effect, Rule 500.2202 voids discretionary clauses in insurance policies issued after June 1, 2007, thus requiring a reviewing court to apply a de novo standard of review.  *See id.* at 603, 609.  In this case, the Court does not have to resolve the issue of whether the rule applies to this case because even under the arbitrary and capricious standard, Plaintiff is entitled to prevail.

The arbitrary and capricious standard "'is the least demanding form of judicial review of administrative action . . . .  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.'"  *Evans,* 434 F.3d at 876 (quoting *Killian v. Healthsource Provident Admins.*, 152 F. 3d 514, 520 (6th Cir. 1998)).  "Consequently, a decision will be upheld 'if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.'"  *Id.* (quoting *Killian*, 152 F.3d at 520).  Although the arbitrary and capricious standard is deferential, it is not "without some teeth."  *Id.* (internal quotation marks omitted).  "[M]erely because our review must be deferential does not mean our review must be inconsequential.  While a benefits plan may vest discretion in the plan

administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Id*. (internal quotation marks omitted).  "Rather, this standard requires us to review 'the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).  The administrator must consider the entire record, not selected portions.  *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 359–62 (6th Cir. 2002); *Satterwhite v. Metro. Life Ins. Co.*, No. 1:06-CV-165, 2007 WL 2746886, at *7 (E.D. Tenn. Sept. 19, 2007).  A court's review is limited to the administrative record at the time that the plan administrator determined the employee's eligibility.  *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010).

### III. Discussion

The court must determine whether (1) Liberty's termination of Scofield's long-term benefits was arbitrary and capricious, and (2) whether Liberty's denial of Scofield's administrative appeal of the termination was arbitrary and capricious.  *See Cooper*, 486 F.3d at 165–69.

### A.  Termination of Benefits

Liberty based its termination decision on its conclusion that Scofield was no longer disabled as defined by the Policy.  As a preliminary matter, the Court notes that Liberty relied solely on three file reviews by physicians solicited through MLS Peer Review Services.  (AR, docket ##15-2, at 286–88; 28-2, at 1475, 1497, 1503.)  Although Liberty retained a right to have claimants examined by a physician or vocational expert of its choice "as often as reasonably required," (AR, docket #14-1, at 87), Liberty elected not to exercise its right.  Rather, Liberty chose to support its termination decision with three file reviews.  Although there is nothing "inherently objectionable

8

about a file review by a qualified physician in the context of a benefits determination," *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005), a plan administrator's decision to conduct a file review rather than a physical examination is one factor to consider in the assessment of whether a plan administrator acted arbitrarily and capriciously, *id.* at 295. "[F]ailure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id.* at 295. Moreover, where conclusions drawn from a file review "include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate." *Id.* at 297 n.6; *see also Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005) ("Whether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician.").

### 1. Dr. Burns

Liberty first relied on the opinion of Dr. Burns. Dr. Burns concluded that, based on the "contradictory medical information," he could not "establish any impairments or resulting restrictions or limitations from a rheumatologic point of view." (AR, docket #28-2, at 1508.) Dr. Burns observed Scofield's pain management treatment by Dr. Javery and P.A. Greene, the consistent presence of muscle tender points (dated 8/24/10, 11/16/10, and 1/18/11), that pain is generally "severe" or "without change," with increasing fatigue and cognitive problems. He also noted Scofield's thyroid treatment and medication history by primary care physician Dr. Braker, including an abnormal Mini-Mental State Examination (MMSE), a neurological evaluation by

Dr. Miller finding subjective cognitive dysfunction, and the FCE by Rounds.[2]  (*Id.* at 1505.)
Dr. Burns stated that he consulted by telephone Dr. Travis and P.A. Greene.  He did not reach
Rounds.  Dr. Travis stated that he had only seen Scofield twice and he could not comment on the
extent of her restrictions and limitations.  According to Burns, P.A. Greene confirmed that there was
a large discrepancy between the "objective physical findings and the claimant's complaints," and that
his assessment of Scofield's disability relied on the FCE.  (*Id.* at 1506.)  Dr. Burns then drew the
following conclusions: (1) Scofield was diagnosed with fibromyalgia and she has muscle tender
points "at times compatible with that diagnosis," and her symptoms were complicated by depression,
(2) the degree of impairment noted by Scofield and the FCE "is not explainable by the available
physical findings," and (3) the FCE was the main support for the degree of functional impairment
because other evidence did not support the extent of impairment.  (*Id.* at 1507–08.)  However,
Dr. Burns explicitly noted that the "FCE should be evaluated by a reviewer experienced in
performing and evaluating them," because the FCE's "validity or lack thereof would go a long way
towards clarifying the degree of impairment."  (*Id.* at 1508.)  Thus, Dr. Burns acknowledged the
presence of both subjective and objective (FCE) evidence of Scofield's inability to work full-time
at even a sedentary job, but Dr. Burns did not evaluate or refute the validity of the FCE in concluding
that, from a rheumatologic perspective, Scofield was not impaired.

---

[2]The Court observes that Liberty hired a surveillance company to conduct surveillance.
Those videos are in the record.  Dr. Burns noted in his report that he reviewed a video of Scofield
riding on a riding lawn mower in 2009.  (AR, docket #28-8, at 1505.)  However, the video does not
appear to have affected his analysis, nor do the parties argue the significance of the videos in their
briefs.

### 2. Dr. Basin

Dr. Basin's review was limited to a psychiatric review of Scofield's file. He observed that although she had been diagnosed with depression, she was not taking an antidepressant. (*Id.* at 1499.) He further noted that Scofield had reported that she was doing well without an antidepressant, (*id.* (08/09/10)), and had been seen by Dr. Victor Wagner, Ph.D. (*id.* (10/11/10)). Dr. Wagner assessed Scofield with a GAF score of 50. Dr. Basin consulted with P.A. Greene, Dr. Travis, and Rounds. They could not comment on Scofield's psychiatric condition. In his conclusions, Dr. Basin noted that although there was "a lot of evidence" of pain that "clearly impact[ed] [Scofield's] functioning," he could not comment on Scofield's physical impairments. (*Id.* at 1501.) From a psychiatric perspective, Dr. Basin concluded that Scofield's depressive symptoms were not severe enough nor well enough documented in the file to support any work restrictions. (*Id.*)

### 3. Dr. Troutt

Finally, in terminating Scofield's benefits, Liberty relied on a file review by Dr. Troutt, who reviewed the records from a physical medicine and rehabilitation perspective. Dr. Troutt attempted but did not consult with Scofield's treating physicians. Dr. Troutt noted a history of diagnosis and treatment for myofascial pain and fibromyalgia, but stated that "treatment notes through Dr. Javery, Dr. Miller, Dr. Rush and Dr. Hamm do not provide objective exam findings of specific painful points to palpation at multiple body regions above and below the waist as well as left and right hand side of the body to support a diagnosis of fibromyalgia." (AR, docket #28-1, at 1484.) Regarding functional capacity, Dr. Troutt disregarded the FCE as outdated and invalid because there were not more recent objective findings from Dr. Javery and Dr. Miller "from a neuromuscular and

11

musculoskeletal standpoint." (*Id.* at 1485.)  Dr. Troutt did not identify or evaluate examinations or treatment notes from P.A. Greene.

Liberty's reliance on the file reviews of Drs. Burns, Basin, and Troutt to terminate Scofield's benefits was arbitrary and capricious, as the reports of the reviewers do not reflect a deliberate, principled reasoning process in light of the quality and quantity of the evidence, nor are their conclusions supported by substantial evidence.  *See Evans,* 434 F.3d at 876.  Scofield's claim is predominantly a physical impairment resulting from fibromyalgia and chronic pain syndrome—although complicated by depression—so the most salient file reviews are those of Dr. Burns and Dr. Troutt.  Dr. Basin did not purport to evaluate Scofield's physical pain.

First, the Court cannot say that Dr. Burns's conclusion is supported by substantial evidence.  Although he identifies a gap between the objective findings of physical examinations and Scofield's subjective complaints, that discrepancy does not constitute substantial evidence, particularly in light of the objective results of the FCE.  Moreover, Scofield's own treating physicians have acknowledged the gap between objective and subjective complaints but have still concluded that Scofield is medically disabled.  For example, Dr. Rush explained in his letter to Liberty on July 28, 2009 that Scofield,

> has a long and complicated medical history, however her most significant medical problems are Chronic Fatigue Syndrome, Fibromyalgia, uncontrolled 2DM, and migraine headaches.  Over the past four years her disease has progressed from Marcie having the ability to be employed full time and manage her disease with an occasional sick day from work to the present time where she is no longer employed and she cannot manage the simplest of ADLs e.g. personal hygiene.

> Marcie spends much of her time in bed and when she attempts to care for her family, e.g. she cannot remember whether or not she left the stove on or where her grandchildren are in the home, nor can she lift her grandchildren or even walk to help them.

> Marcie's fatigue and pain are simply not controlled by any single method and she has failed multiple rehabilitation therapeutic modalities.  She has had an exhaustive diagnostic work up and there are few imaging or laboratory markers to define her disease progression.  It is all based on clinical symptoms.

(AR, docket #16-1, at 483.)  Dr. Rush nonetheless concluded that Scofield was "fully disabled due to her inability to perform the most basic ADL and the loss of her memory and chronic pain."  (*Id.*) Dr. Burns's analysis offers no counter to Dr. Rush's conclusion that, based on his treatment notes and "exhaustive diagnostic work up" that Scofield cannot perform even basic daily activities.  Quite the opposite, Dr. Burns noted in his report Scofield's history of progressively worsening pain, fatigue, and cognitive problems as seen in treatment notes from Dr. Javery, P.A. Greene, and Dr. Braker.

Perhaps more concerning is Dr. Burns's conclusion despite the FCE's objective findings that Scofield was unable to perform even sedentary work on a full-time basis.   Essentially, Dr. Burns acknowledges that the FCE corroborates Scofield's subjective degree of functional impairment, and states that further evaluation of the FCE's validity would be useful, but concedes that he is not qualified to evaluate the FCE, thus leaving the question open.   (AR, docket #28-2, at 1508.)  In effect, Dr. Burns's conclusion ignores the FCE and Scofield's subjective reports of pain[3] without explanation.  As such, it cannot constitute substantial evidence.

Dr. Troutt's conclusion was similarly unsupported by substantial evidence.  First, Dr. Troutt's conclusion that the medical evidence does not support a diagnosis of fibromyalgia due to lack of objective exam findings is abundantly contradicted by the record.  For example, the record contains at least 17 clinical notes from physical examinations by various doctors between 2000 and 2011 with

---

[3]See the discussion of subjective versus objective evidence with respect to Dr. Smith's analysis.

objective exam findings related to fibromyalgia, including five instances where 18 out of 18 classic fibromyalgia trigger points were indicated and one where 16 out of 18 trigger points were indicated. (AR, docket #16-5, at 669–75.)  One of those examinations was conducted on February 15, 2011 by P.A. Greene, who documented tenderness to palpation in both upper and lower right and left extremities, tenderness to palpation at the cervical, thoracic and lumbosacral spine, and identified 18/18 traditional tender points.  (AR, docket #15-4, at 365–68.)

Finally, the more glaring defect of Dr. Troutt's report is that he disregarded the FCE because he thought it was conducted on January 31, 2010, not January 31, 2011, and the record lacked updated, objective evidence of Scofield's functional limitations.  Dr. Troutt did not consult Scofield's treating physicians, nor did he conduct an examination.  Dr. Troutt did not purport to evaluate the validity of the FCE.  Thus, the record before Dr. Troutt contained volumes of clinical notes documenting subjective complaints of pain, physical examinations confirming fibromyalgia trigger points, and the FCE.  In light of the quantity and quality of the evidence supporting disability, it cannot be said that Dr. Troutt's conclusory statements constitute substantial evidence.

Taken together, Liberty's reliance on the three file reviews was unreasonable as the reports from Doctors Burns, Basin, and Troutt do not reflect a deliberate, principled reasoning process, nor are their conclusions supported by substantial evidence.  Upon receiving documentation from Drs. Rush and Hamm in 2009, Liberty initially granted Scofield long-term disability benefits.  The medical record undeniably reflects Scofield's deteriorating condition.  Although there are some clinic notes showing intermittent stability of chronic pain, (*see, e.g.*, AR, docket #15-4, at 360, 369–70), the record does not reflect that by April 27, 2011, Scofield's condition had changed in any

perceptible way to justify the termination of her disability benefits, nor did Liberty offer such an explanation.

## B.     Denial of Administrative Appeal

### 1.     New evidence

In support of her administrative appeal, Scofield attached a Physician Statement of Disability form from Dr. David Sova, Scofield's then-primary attending physician, dated September 28, 2011. (AR, docket #15-3, at 317–18.) Dr. Sova stated that he first evaluated Scofield on July 6, 2011 for fibromyalgia and its symptomology. (*Id.* at 317.) He described an unsuccessful trial prescription of Savella, which resulted in more severe symptoms, and a recent course of Neurontin. (*Id.*) He also observed that Scofield was being treated at the Javery Pain Institute, where she received pain management treatment by Dr. Javery and P.A. Greene. (*Id.*) After reviewing her diagnoses, Dr. Sova concluded that it was his medical opinion that Scofield was disabled from her own occupation and was totally and permanently disabled from any other occupation for which she was reasonably suited by training, education, experience, age, and physical and mental capacity. (*Id.* at 317–18.) Also accompanying Dr. Sova's letter were treatment notes from Dr. Sova dated July and August 2011. (*Id.* at 325–32.)

### 2.     Dr. Smith

In reviewing Scofield's claim on appeal, Liberty solicited Dr. David Smith, an internist specializing in rheumatology, to conduct a file review. Dr. Smith did not examine Scofield. Dr. Smith consulted Dr. Sova and P.A. Greene by telephone for 10 minutes each. According to Dr. Smith, Dr. Sova indicated Scofield was "improved" and Dr. Sova was "unaware of any specific historical feature or physical limitation that would cause functional impairment that would interfere

with work." (AR, docket #15-1, at 264.) According to Dr. Smith, P.A. Greene agreed that Scofield's "subjective influences were most likely playing some type of role in the validity, accuracy and reliability of the recent FCE results." (*Id.*) "In other words," Dr. Smith wrote, "strong reliance about employability based on the conclusion of the functional testing may be in error." (*Id.*) Dr. Smith further explained that P.A. Greene agreed that Scofield "could work at some degree but other subjective or possibly ill-defined motivation issues may bias her actions in seeking employment." (*Id.*) Dr. Smith went on to summarize Scofield's treatment history, noting a history of soft tissue tender points and the decision to use narcotics to treat pain. (*Id.* at 265.) He also noted Dr. Sova's Physician Statement of Disability, observing that it did not provide a specific basis for the opinion that Scofield was disabled from her occupation or any occupation. (*Id.*) Dr. Davis then opined on the FCE results, which he characterized as the most salient medical evidence in the record. He questioned the validity of the FCE methodology, raising the following six "items of interest and potentially troubling for overall validity and reliability" of the FCE report: (1) Scofield was referred to the center by the pain clinic provider but details of the relationship were not disclosed and could possibly influence result interpretation, (2) during the exam, Scofield was noted to forward bend at waist without functional limit when not specifically prompted but later not able to perform a similar task without stated pain, (3) the overall weakness and coordination in report is influenced by Scofield's own pain interpretation and "safety issues" are not well explained by the examiner, (4) the statement "inability to assume position for safe lifting" was not consistent with basic features of fibromyalgia, so other non-fibromyalgia influences were likely interfering, (5) there was no indication that attempts to reproduce data/results were performed, and (6) the mildly elevated pulse

16

and shortness of breath used to measure "maximum effort documented" was misleading in

Dr. Smith's opinion because it can be attributed to deconditioning, not fibromyalgia.  (*Id.* at 265.)

> Dr. Smith then opined that,

> based on the entire medication file, interviews with providers and review of FCE,
> that [Scofield's] self reported pain does not in itself limit any employability.  Overall
> pain from fibromyalgia in evidence-based studies is considered readily treatable with
> a variety of medications as is the case in this situation.  Pain control coupled with
> some durable form of ongoing exercise as the claimant has embarked on thankfully
> affords her the opportunity to continue not only to perform her self-described
> household chores but office or other employment related tasking as well in a
> meaningful way.

(*Id.* at 269.)

Although Dr. Smith's report gives more consideration to the validity of the FCE than the

three prior file review reports, Dr. Smith's list of concerns do not amount to substantial evidence in

support of his conclusion that Scofield's conditions are not disabling.  First, regarding Dr. Sova's

statement, Dr. Smith noted that Dr. Sova said (1) Scofield was "improved," and (2) he was "unaware

of any specific historical feature or physical limitation that would cause functional imairment that

would interfere with work."  (*Id.* at 264.)  As these are oral statements reported by Dr. Smith without

context—such as whether they were yes or no responses to specific questions, worded in a specific

way—they should be considered in light of Dr. Sova's Physician Statement of Disability.  In his

statement, Dr. Sova indicated that he had treated Scofield for approximately three months, including

an unsuccessful trial of Savella and later course of Neurontin.  (AR, docket #15-3, at 317.)  He

recognized that she was being treated at the Javery Pain Institute, and presumably was aware of her

long history of unsuccessful treatment for fibromyalgia and chronic pain and that she was taking

morphine to control pain.  (*See id.*)  He then stated that it was his medical opinion that Scofield was

not only disabled from her own occupation but also other occupations for which she was reasonably suited by training, education, experience, etc. (*Id.* at 317–18.) Out of context, that Dr. Sova may have used the word "improved," without more specificity, to describe Scofield's condition can only reasonably be assigned minimal weight because there is no other information in Scofield's medical records to suggest that her condition had improved, including Dr. Sova's notes. At most, the record supports that Scofield's pain had stabilized with the use of morphine and other pain medication. (*See, e.g.*, AR, docket #15-4, at 360, 369–70 (documenting pain of 7 out of 10 on a scale of 1 to 10, and noting that the "pain is the same" as the previous visit).) Dr. Smith did not provide any examples of improvement. Second, that Dr. Sova acknowledged that he was "unaware of any specific historical feature or physical limitation" that would impair with Scofield's work functionality is highly suspect in light of Dr. Sova's unequivocal opinion that Scofield is disabled not only from her own occupation but from other occupations as well. Thus, Dr. Smith's consultation with Dr. Sova does not constitute substantial evidence.

Similarly, Dr. Smith's consultation with P.A. Greene is not substantial evidence in support of Dr. Smith's conclusion. According to Dr. Smith, P.A. Greene "agree[d] that subjective influences were most likely playing some type of a role in the validity, accuracy and reliability" of the FCE results. (AR, docket #15-1, at 264.) Again, this paraphrased, oral statement, should not be read out of context. Rather, it must be considered in light of P.A. Greene's treatment notes and prior statements in the record. Indeed, P.A. Greene's opinion deserves significant weight, as he consistently evaluated and treated Scofield for pain over the course of several years. Although P.A. Greene did not provide a Physician Statement of Disability, P.A. Greene was aware of the historic discrepancy between Scofield's subjective reports of pain and physical findings and nonetheless

18

found Scofield to be impaired.  (*See* AR, docket #28-2, at 1506 (discussion notes with Dr. Burns).)

More importantly, P.A. Greene's statement recognizing the potential influence of subjective forces

on the FCE was not surprising.  His statement was nuanced—"most likely playing some type of

role"—without overstating or drawing speculative conclusions about the FCE.  Altogether, P.A.

Greene's statement acknowledging how subjective forces can affect functional capacity testing is

not substantial evidence supporting Dr. Smith's finding that Scofield was not disabled.

Finally, the remainder of Dr. Smith's report addressed the validity of the FCE.  Dr. Smith

concluded that the FCE was not objectively derived and therefore refused to give it weight.  The

conclusion that the FCE was not "objectively derived," is an insufficient reason, standing alone, to

disregard the test results entirely.  *See, e.g.*, *Glenn v. MetLife*, 461 F.3d 660, 673 (6th Cir. 2006)

(observing that although self-reported or subjective complaints may be accorded less significance,

it is unreasonable to dismiss them entirely); *Evans v. UnumProvident Corp.*, 434 F.3d 866, 879 (6th

Cir. 2006) (termination of benefits was arbitrary and capricious, in part because the administrator

discredited subjective reports when the policy did not state that self-reported occurrences were to be

accorded lesser significance when considering whether a person is able to work); *Black & Decker*

*Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not

arbitrarily refuse to credit a claimant's reliable evidence").  In this case, the Policy does not define

proof of disability, nor does it limit proof to objective evidence of disability.  Thus, Dr. Smith's

rejection of the report on the basis that it was not objectively derived does not constitute substantial

evidence supporting his decision.  Dr. Smith did, however, offer a laundry list of "concerns" about

the FCE's validity that the Court will address.

First, Dr. Smith raised the concern that Rounds may have been biased toward a finding of disability because Scofield was referred to Rounds by the Javery Pain Institute.  However, there is no evidence to validate Dr. Smith's speculation.  As such, it cannot support his conclusion.

Second, Dr. Smith raised concerns about inconsistency of results because Rounds documented that Scofield could bend forward to retrieve her purse but was not able to perform a similar task later. It appears that Dr. Smith may have misinterpreted the similarity between the two movements, as the FCE documents that Scofield was able to reach her purse using forward trunk movement while seated—not standing—and, Rounds observed, "[f]orward bending at the trunk while standing was significantly limited due to pain and loss of balance."  (AR, docket #16-4, at 609.)  Alternatively, if Dr. Smith was referring to the "reach forward" test, Rounds documented that Scofield's movement was "slow and guarded" with progressive bilateral neck and shoulder pain, suggesting that Scofield could not perform the movement on any sustained basis.  (AR, docket #16-4, at 609–10.)  Thus, after careful review of the FCE, Dr. Smith's concern is not warranted.

Third, Dr. Smith stated that the "overall weakness and coordination in report is influenced by both the claimant's own pain interpretation" and the term "safety issues" as used by the examiner was not well-detailed.  Although Dr. Smith did not provide specific examples of how Scofield's pain interpretation influenced her performance on the tasks, even granting some subjective influence, such a concern goes to the overall weight of the FCE results, but cannot be reasonably interpreted to invalidate the results in their entirety.  Similarly, although the Court agrees the term "safety issues" is not explained, the test was administered by a trained occupational therapist who exercised her professional opinion in determining which activities were unsafe for Scofield to perform in light of her observed limitations.  Thus, these concerns do not undermine the validity of the FCE results but

may speak to the weight of the results, as considered in light of the quantity and quality of the evidence in the record.

Fourth, Dr. Smith stated that the "inability to assume position for safe lifting" during the exam was "not consistent with basic features of fibromyalgia" and other non-fibromyalgia influences most likely interfered with the task.  A careful review of the FCE report shows only one instance in which Scofield was unable to assume the position for safe lifting—the "bi-manual lift (floor to waist)".  (AR, docket #16-4, at 610.)  Although the exact reason Scofield could not assume the position is not noted, on the same page, Rounds documented that Scofield was unable to assume a squat position, suggesting that the reason Scofield could not perform the exercise was that she could not maneuver her body to both squat and reach forward to grasp the weights.  (*Id.*)  Although Dr. Smith may be correct that such physical limitation may not be directly attributable to fibromyalgia, it is undeniable that Scofield's other conditions, including obesity—as opposed to a speculative lack of motivation—limited her ability to complete the task.  As the FCE is not a measure of the isolated limitations of fibromyalgia, but rather a measure of Scofield's combined restrictions and limitations, Dr. Smith's concern is not a reasonable basis to discredit the FCE.

Fifth, Dr. Smith observed that report did not indicate that "attempts to reproduce data/results were performed."  (AR, docket #15-2, at 265.)  Although repeatability is a standard measure of validity, that the examination was not repeatedly performed goes to weight, but does not invalidate the results.  Dr. Smith is free to consider that the test was not reproduced as one factor in determining the amount of weight to assign the FCE.  However, there is no indication in Dr. Smith's report that FCE tests are normally reproduced multiple times before professionals in the field rely on such results.  That it was not reproduced is not a reasonable justification for ignoring or disregarding the

results, nor, in light of the quality and quantity of the evidence does it constitute substantial evidence supporting denial of Scofield's appeal.  A contrary rule would lead to absurd results, as file reviewers could dismiss objective evidence of functional limitations by stating that it had not been reproduced a sufficient number of times to be valid.  In light of the fact that Rounds administered an in-person test of Scofield's functional limitations and Dr. Smith did not examine Scofield, Dr. Smith's concern does not constitute substantial evidence.

Sixth, Dr. Smith raises the concern that the FCE's indicators of maximum effort exerted—elevated pulse, Scofield's report of shortness of breath, and "decline in safety"—are misleading measures because they are "most likely" from deconditioning, not fibromyalgia. Dr. Smith misstates the report's explanation of effort.  "Effort: Maximum effort was documented during the physical examination and with most functional tasks as evidenced by the presence of physiological signs of effort exertion e.g. an accelerated heart rate, shortness of breath and decline in safety." (AR, docket #16-4, at 611.)  Although vague, this explanation does not state that it relied on Scofield's self-reports of shortness of breath, but rather suggests that the physiological signs were objectively manifested.  Moreover, as above, because the FCE measures Scofield's overall functional limitations, which includes poor health and deconditioning related to chronic pain syndrome and fibromyalgia, and not the isolated limitations of fibromyalgia, Dr. Smith's concern does not undermine the FCE's validity.  Although Dr. Smith is free to question whether Scofield exhibited maximum efforts, the FCE was nonetheless administered by a professional occupational therapist who used her professional judgment during an in-person examination.  As Dr. Smith did not examine Scofield, his speculation does not constitute substantial evidence supporting a denial of Scofield's

benefits. Rounds is trained to administer FCEs, but there is no evidence in the record that Dr. Smith has experience or expertise in occupational therapy or administering FCEs.

Finally, notably absent from Dr. Smith's report or Liberty's denial letter is a discussion of specific changes in Scofield's symptomology that suggest she is no longer disabled. Although the burden is on Scofield to submit evidence of her disability, it is suspect that Liberty granted Scofield benefits for a period of almost two years before determining she was not disabled within the meaning of the Policy. Despite Scofield's worsening situation between 2009 and 2011, Liberty's denial lacks an overarching explanation for its reversal.

Taken together, Liberty's reliance on Dr. Smith's report to deny Scofield's administrative appeal was arbitrary and capricious because Dr. Smith's report did not reflect a deliberate, principled reasoning process, nor was it supported by substantial evidence.

### IV. Relief

Scofield brought her claim for benefits pursuant to ERISA section 502(a)(1)(B), which allows a plan participant or beneficiary to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The principal relief under this section is an order reinstating benefits and awarding retroactive benefits. *See, e.g.*, *Glenn*, 461 F.3d at 675.

Liberty argues that because it has not evaluated Scofield under the definition of disability applicable after 24 months of long-term benefits, if the Court finds its termination of Scofield's long-term benefits to be arbitrary and capricious, the appropriate remedy is to remand to Liberty consideration of Scofield's eligibility for long-term benefits under the narrower definition.

23

The Policy defines "disability" or "disabled" in two tiers.  The first tier requires the claimant to establish that she is "unable to perform all of the material and substantial duties" of "[her] occupation on an Active Employment basis." (AR, docket #14-1, at 61.)  The second tier definition states:

> After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

(*Id.*)

"[R]emand to the plan administrator is appropriate 'where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled.'" *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007) (quoting *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006)).  In *Welsch v. Wachovia*, 191 F. App'x 345 (6th Cir. 2006), the Sixth Circuit vacated and remanded a district court order awarding long-term disability benefits because the district court lacked a sufficient administrative record from which to review the plan administrator's determination regarding long-term benefits.  *Id.* at 356. Similarly, in *Counsell v. Liberty Life Assur. Co. of Boston*, the district court, noting the two-tier definition of the ERISA plan, remanded to the plan administrator for determination of whether the claimant was eligible for benefits under the second tier definition.  No. 08-14236, 2010 WL 1286695, at *6–7 (E.D. Mich. Mar. 31, 2010).

In this case, Liberty has only reviewed Scofield's claim for benefits under the more inclusive "own occupation" standard, not the "any occupation" standard.  As such, Liberty has not considered what other occupation, if any, Scofield may be able to perform.  Thus, this case is distinguishable

24

from cases with sufficient administrative records from which to draw the conclusion that a claimant has "clearly established" disability from any occupation. *Cf. Cooper*, 486 F.3d at 171.  Therefore, the Court will order an immediate reinstatement of long-term disability benefits between April 28, 2011 and June 25, 2011.  However, the Court will remand consideration of Scofield's eligibility for long-term disability benefits under the "any occupation" standard to Liberty for a full and fair review.

## V. Conclusion

For the reasons stated above, the Court will grant judgment in favor of Scofield with respect to long-term disability benefits through June 25, 2011.  However, it will remand to Liberty consideration of Scofield's eligibility for benefits after June 25, 2011.


Dated:  September 30, 2013                                  /s/ Robert J. Jonker
                                                    ROBERT J. JONKER
                                                    UNITED STATES DISTRICT JUDGE